UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

       v.                                              CASE NO. 8:06-cr-508-T-23MAP

BIBI SHANAZ LALL
_____/

## REPORT AND RECOMMENDATION

Lall, a bank manager of a small bank, moves to suppress two post-*Miranda* statements she made about her bank's robbery to two separate agencies almost two months apart (doc. 19). She gives these reasons for suppressing her admissions: Hillsborough County deputies coerced her first admissions by threats and promises of leniency, this illegality tainted her later admissions to the FBI after this indictment's return, and the FBI illegally interrogated her after her state public defender invoked her right to remain silent and to counsel in a pleading filed in her state action. With the benefit of an evidentiary hearing, and having carefully reviewed the video of her first interrogation, I find Lall voluntarily waived her *Miranda* rights on both occasions and that her will was not "overborne by the circumstances surrounding the giving" of her statements. *See Dickerson v United States,* 530 U.S. 428, 434 (2000). Accordingly, I recommend the district judge deny her motion to suppress.[1]

*A. Facts*

A lone black male entered the Trustco Bank in Apollo Beach, Florida on the

---

[1] The district judge referred this matter to me for a report and recommendation (doc. 20). *See* 28 U.S.C. § 636 and Local Rule 6.01(b).

afternoon of October 21, 2006. Armed with a firearm, the robber approached Lall and instructed her to take him to the vault area, where the bank's only other employee (a teller) was located. The robber demanded the teller empty his drawer into a gym bag. Next, the robber made the teller lie down in the ATM room, tied his hands with a necktie, and shut the door. A few minutes later, Lall entered the ATM room, removed the surveillance tape from the video monitor, and again shut the door. About five minutes later, the teller heard a door slam. He looked at a video monitor but did not see the robber. Freeing himself, the teller found Lall in the vault area, who told him to sound the panic alarm. The robber, who the government claims is Paul Anthony Graham, Lall's codefendant, made off with more than $125,000.

*1. Lall's first admissions*

Lall's initial statements about the crime and the peculiar circumstances of the robbery (Lall claimed the robber sexually assaulted her before leaving), puzzled investigators. This prompted them to ask Lall to take a polygraph examination. Two days after the robbery, Hillsborough County Sheriff's Detective Bruce Metzger and FBI Special Agent William Woodson visited Lall at her Bradenton home and approached her about taking the exam. She agreed, and in a separate car accompanied by her victim advocate, met Metzger later that day at the Sheriff's operation center in Ybor City.[2]

At the outset, the polygraph examiner (Detective Sandra Streator) reviewed two

---

[2] Due to the alleged sexual assault, Lall had been assigned a victim advocate.

forms with Lall.[3] One advised Lall of her *Miranda* rights and specifically advised Lall she was "not under arrest" and was "free to leave this office at any time during this interview." The other memorialized her free and voluntary consent to the exam, explained the subject matter to be covered ("Trustco Bank Robbery on 1/21/06"), and briefly detailed her current mental status and educational background (both forms are included in government ex. #1). Lall signed both and then submitted to the exam. When asked if she knew who robbed the bank and if she planned with anyone to rob the bank, Lall answered "no." Streator interpreted these as deceptive responses.

At this juncture, Detective Metzger entered the exam room and along with Streator questioned Lall. Lall repeatedly denied any participation in the robbery or knowledge of the robber's identity. After about an hour and fifty minutes, Lall asked to talk to a family friend. The detectives refused her request. She then admitted she had an affair with an individual named Robo, that she knew Robo's associate (Graham) would rob the bank, and that if she did not cooperate Robo would tell her husband. Fearful, and particularly concerned about losing her children because to the affair, she went along with the robbery.

Armed with her statements, state authorities charged Lall with two counts of being an accessory after the fact. On October 24, a public defender was appointed to her case and quickly filed a "Notice of Defendant's Invocation of Constitutional Rights." This document expressed Lall's desire to remain silent and exercise her right to counsel

---

[3] The Hillsborough County Sheriff's Office recorded these events and the subsequent interrogation. *See* government's ex. 5.

when confronted with any future custodial interrogation by either "local, State or Federal police or prosecution personnel (including jail inmates acting at the request or direction of such personnel)." *See* government ex. #7.

### *2. Lall's second admissions*

On December 12, 2006, a federal grand jury returned the instant indictment accusing Lall and Graham with armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d) and 2 (doc. 1).[4] The state, in turn, dismissed its charges. On December 19, Lall, escorted by family members, turned herself into the FBI's Tampa office as prearranged the day before. FBI Special Agent Woodson explained to Lall she would be making an initial appearance before a magistrate judge and would be seen by Pretrial Services. He also informed her that her truthful cooperation would benefit her. Lall agreed, and after being advised of her *Miranda* rights and signing a written consent to be interviewed (government ex. #3), she told agents of her involvement in the robbery and Graham's blackmail efforts (*see* FBI 302 at government ex. #4).

### B. Discussion

Determining if a confession is voluntary requires examining "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson v. United States,* 530 U.S. 428, 434 (2000) citing *Schenckloth v. Bustamonte,* 412 U.S. 218, 226 (1973). This necessitates evaluating "'the totality of the circumstances – both the characteristics of the accused and the details of the

---

[4] Graham is charged in count two with using a firearm in relation to a crime of violence per 18 U.S.C. § 924(c).

interrogation.'" *Id.* The focus is the "crucial element of police overreaching." *Colorado v. Connelly,* 479 U.S. 157, 163 (1986). "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process." *Id.* at 164. Conduct reaching this threshold confession usually involves subjecting an accused to an exhaustingly long interrogation, applying physical force or threatening it, or the making of a promise that induces a confession. *United States v. Thompson,* 422 F.3d 1285, 1295-96 (11th Cir. 2005). Isolated instances of deception, or unrealistic predictions of penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice. *United States v. Jones,* 32 F.3d 1512, 1517 (11th Cir. 1994). Furthermore, the Supreme Court has observed that "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson,* 530 U.S. at 444, quoting *Berkemer v. McCarty,* 468 U.S. 420, 433, n. 20 (1984).

*1. Lall's statements to detectives*

Against this framework, Lall says she finally confessed because the two detectives, but principally Meztger, threatened to "take away her kids," made "unrealistic predictions" of probation or less, and insinuated that if she did not cooperate promptly she would be turned over to the federal authorities for prosecution, a much more ominous consequence than a state prosecution. To support her claims, she points to various comments Metzger made. Yet, Metzger's conduct, particularly when its evaluated in the context of the entire interrogation, fails to breach that "rare" level of police overreaching

needed in post-*Miranda* scenarios. Instead, Lall's decision to abandon her denials are more "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Colorado v. Connelly,* 479 U.S. at 170. Lall's testimony at the suppression hearing confirms this conclusion.

     Lall is not uneducated. She graduated from high school, then attended a trade school for a year and a half, and held a supervisory position at her place of employment. During the interview, until she admits her knowledge of the robbery, she remains remarkably composed. Although she testified at the suppression hearing that she "cried the whole time," her recorded interrogation shows none of this. In short, I find her testimony unbelievable. Only when she changed her account did she show any emotion. Just as importantly, and she does not argue otherwise, Lall concedes voluntarily waiving her *Miranda* rights at the outset of the interview. Aware of those rights, Lall neither terminated the interview nor asked for a lawyer despite the detectives' persistent appeals to her emotions and reason. Unquestionably, she hoped to keep her bank job by persuading the investigators she knew nothing about the robber.

     Rather than coercion and deception as Lall now claims, a careful review of the interrogation reveals the detectives' use of psychological pressure and reasoning to persuade her "to tell the truth." The two employed more than a dozen themes common to police interrogations: we know you are lying and the polygraph proves it; we have a job to do and have no personal animosity against you; we want to help you; we will find out the truth anyway and if we don't, the FBI with all their resources will; we empathize with human frailties and understand the potential motives for committing the offense (debt,

lifestyle needs, other unknown reasons); your being involved does not mean you are a bad person; the truth will set you free; save the rest of your life; do the right thing; think of your children; be a role model for your children; think about the consequences to you, your family, and particularly your children when you are in prison; now is the chance to correct your mistakes; life will be better for you if you cooperate; this crime may not be as bad as you think (a property crime or embezzlement as opposed to a robbery); and do not put us in the position of referring your case for federal prosecution because the result will be harsher that any state prosecution.  None of these pleas, either individually or collectively, attains that "rare" level of police overreaching so as to be "offensive to a civilized system of justice that they must be condemned." *Dickerson,* 530 U.S. at 444*; Colorado v. Connelly,* 479 U.S. at 163.

   Lall particularly objects to the detectives' play on her emotions as a mother complaining Metzger threatened she could lose custody of her children, a "legally unrealistic" proposition under the circumstances (doc. 19 at p. 8).  And she argues the Supreme Court condemned this very tactic in the pre-*Miranda* decision of *Lynumn v. State of Illinois,* 372 U.S. 528 (1963).  But *Lynum's* facts are materially distinguishable from Lall's experience.  In *Lynumn,* the police directly threatened the defendant with the removal of her children.

   Three Chicago police officers arrested James Zeno for unlawful possession of narcotics.  He cooperated and contacted his source, Beatrice Lynum.  When she approached Zeno, the police officers arrested her and then questioned her about her source of supply in Zeno's presence.  At one point, the interrogating officer told Lynumn

"[she] could get 10 years and the children could be taken away, and after [she] got out they would be taken away and strangers would have them, and if [she would] cooperate he would see they weren't … and [she] had better do what they told them if [she] wanted to see her kids again." *Id.* at 531. Lynumn, who said her confession was false, stated the only reason she confessed was "the hope of saving herself from jail and being taken away from my children." *Id.* at 532. The police did not deny her account. The Court suppressed Lynum's statements finding that "a confession made under such circumstances must be deemed not voluntary, but coerced." *Id.* at 534.

In contrast, Metzger took a less direct approach. And while some of his comments are inappropriate, when viewed in balance with the context of the entire interview, they are not so objectionable as to reach the constitutional disapprobation of *Lynumn*. *See United States v. Jones,* 32 F.3d 1512, 1517 (11th Cir. 1994) (tactic used by police – unless defendant explained the participation of his girlfriend they would continue to consider her a suspect – not considered a threat); *see also McCalvin v. Yukins,* 444 F.3d 713 (6th Cir. 2006) (officer's statement that defendant would not have contact with her family materially contrasted with *Lynumn's* facts, particularly given that defendant made statements after *Miranda* warnings); *United States v, Abfalter,* 340 F.3d 652, 653 (8th Cir. 2003) (police never attempted to threaten defendant with placing his children in foster care because in the context of the statements by the police the comments about foster care were not threats). Indeed, Lall showed no reaction to any of Metzger's statements; instead, she remained calm sitting comfortably with her hands often clasped on her torso.

8

The following excerpts (together with their times) cover Lall's objections to Metzger's tactics. Curiously, Lall never asks Metzger or Streator questions in response to these comments. Nor does she invoke her right to counsel, to remain silent, or to terminate the interview. Rather, she either says nothing or succinctly denies lying to the detectives.

> I just have a job to do and I am trying to do it professionally. I have nothing against you personally and I am not here to judge you. I do not think poorly of you. To be honest with you, until now I never met you before. When this is all over I want the best for you. .... Do you think it makes me feel good to send people to prison for years. It doesn't. I walk away scratching my head. Did I do the right thing? This person is never going to see his kids. They made a mistake.

government's ex. #5 at 2:05.

> For me the goal is to find out the truth. And if there is way to help you I would like to know what that way is. But I know one thing. If you lie and we get evidence and go to a jury trial and you lose you are going to get sentenced to prison. And then you won't see the kids and you have got a four year old. And I know about that because I was in child abuse investigator dealing with DCF. In fact I went to a Termination of Parental Rights hearing just recently on somebody that is going to prison for twenty-five years. Not only are they in prison for the twenty-five years, but now because their parental rights are terminated they can't have visitation with the kid. The bio mother cannot bring them. Because without that termination of parental rights she would have to bring them, but now she can't. So he will not see the kids for the next twenty-five years. I do not recall old you are, but this guy is about thirty-seven. So he can see his kids in his early sixties. And to be honest with you, I feel like the guy made a mistake. You know, he wanted to stick to his baloney story versus the evidence that was developed. And like I said. This is not going to go away just because you walk out that room right now. And that shouldn't be your goal. And I know some people make their goal making out of this room without telling the truth. When the goal should be to tell us the truth right now so that we can wrap this up.

*Id.* at 2:06.

> No you didn't [responding to Lall's statement that she had answered the polygraph questions truthfully]. You didn't and see you keep going back to that. No you didn't, you lied. You lied on the question. You did. She

9

> [Streator] has been doing this a long time. She does polygraphs every single day. Every day. You lied on the test. You lied. You failed it. This is why I trying to talk sense to you. This is the time. This is the chance to tell us what really happened in the bank. If the money is not recoverable – fine. Fine, it is not recoverable. We will do what we can to get it back if we can. If not, fine, what are you going to get. You will get some restitution against you. But you still need to cooperate. Don't you want ... I am telling you ... do you think you want to spend one night without your kids. One night – try 15 years. And try sitting there and having the State of Florida take your kids away or worse the federal government. Because the FBI stays in it after today. Because tomorrow morning when I get on the phone with him [SA Woodson], it's back on.

*Id.* at 2:30.

> I think what you are afraid of more than anything at this point is you are going to be embarrassed and not afraid of the real things you should be afraid of which is going to state prison and having your children taken away from you and not be able to see them except for weekends. Have your mom come in, have your four year old come in and tell you what happened at school – this month – instead of sitting at dinner and saying what happened today. It's real. That's real, not what is going on in your head. I am going to get away with it. I am going to get away with it.

*Id.* at 2:37.

In the main, Meztger's comments only foretold what Lall likely knew. If convicted, she could go to prison. She would then be separated from her family and her children. On the other hand, if she told detectives about her affair, her husband would discover her unfaithfulness. That too would bear consequences. About a half hour after the last excerpt, Lall abruptly and tearfully admitted she knew about the robbery. But unlike the defendant in *Lynum* who unequivocally stated she only confessed to keep her children, Lall equivocated about her motives. On cross-examination at the suppression hearing, she conceded she had not been truthful with the detectives at the outset because she feared losing her children if her husband learned about her affair – her exact

10

motivation for not warning about the robbery beforehand.

Lall's other complaints about Metzger's conduct also fail. Admittedly, some of his comments were unrealistic, either as to the potential charges or the eventual outcome if she did or did not cooperate. He painted a harsh portrait of federal prosecution and sentencing. Yet, taken as whole, Metzger's actions are not much different than those in *Jones,* a case in which the Eleventh Circuit affirmed the denial of a motion to suppress by the defendant on similar complaints. *See* 32 F.3d at 1516-17. In sum, I conclude Lall freely, rationally, and voluntarily chose to admit her involvement to the two detectives. *Id.*

### 2. *Lall's statements to the FBI*

Lall does not strenuously maintain Special Agent Woodson threatened her or promised her leniency, and to the extent that she argues that the agent did this I do not find her account credible. Woodson accommodated Lall by allowing her to surrender at his office as agreed. Nothing about his interview, aside from circumstances incumbent with any surrender to a serious charge, smacked of coercion, intimidation, or improper influence. Her principal contention here is that her "inadmissible statements" to the detectives tainted her later statements to the FBI. *See Wong Sun v. United States,* 371 U.S. 471, 485-86 (1963). Obviously, for the reasons outlined, this argument is unavailing.

Besides, even assuming Lall's initial statements were inadmissible, this would not mean her confession to the FBI almost two months later would automatically be inadmissible. As the government notes, courts look at a variety of factors for deciding if

the later statements should be suppressed: did the objectionable conditions of the first confession persist into the second; the break in time between the two; whether the defendant received *Miranda* warnings; and other relevant factors.  *See Watson v. DeTella,* 122 F.3d 450, 455 (7th Cir. 1997); *United States v. Marenghi,* 109 F.3d 28, 33 (1st Cir. 1997).  Frankly, as the government argues, all these factors coalesce in its favor.  The first confession, even if one were to arguably accept Lall's constitutional objections, did not impermissibly taint the second.

Lastly, Lall argues SA Woodson obtained her statements in violation of her Sixth Amendment rights to counsel.  Namely, her public defender filed an *Edwards* notice in her state case telling all, including federal investigators, she intended to remain silent and invoke her right to counsel.  *Edwards v. Arizona,* 451 U.S. 477 (1981).  This claim is without merit.  First, the Supreme Court has stated that Sixth Amendment right to counsel is offense specific and cannot be invoked once for all future prosecutions.  *McNeil v. Wisconsin,* 501 U.S. 171, 175 (1991).  Just as importantly, Lall's state and her federal charges, although pertaining to the same criminal episode, are separate offenses for Sixth Amendment purposes.  The reason is that each prosecution involves separate sovereigns.  In short, Lall's state invocation of her right to counsel did not carry over to any later federal prosecution.  *See United States v. Coker,* 433 F.3d 39 (1st Cir. 2005) (involving similar argument in the context of a state and federal arson prosecutions); *United States v. Avants,* 278 F.3d 510 (5th Cir. 2002) (same but for state and federal murder charges).          *C.  Conclusion*

For the reasons stated, it is

RECOMMENDED:

1. That the Defendant Bibi Lall's motion to suppress statements (doc. 19) be DENIED.

IT IS SO REPORTED at Tampa, Florida on April 30, 2007.

## NOTICE TO PARTIES

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date it is served on the parties shall bar an aggrieved party from a de novo determination by the District Court of issues covered in the report, and shall bar the party from attaching on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982)(*en banc*).

cc: Hon. Steven D. Merryday
 Plaintiff Counsel
 Defense Counsel